UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GUY B. TERRY, | CIV. 04-5103-KES |
| Plaintiff, | |
| vs. | ORDER REVERSING AND REMANDING THE COMMISSIONER'S DECISION |
| JO ANNE B. BARNHART, Commissioner, Social Security Administration, | |
| Defendant. | |

Plaintiff, Guy B. Terry, moves the court for a reversal of the Commissioner of Social Security's decision denying his application for a period of disability, and disability insurance benefits commencing May 6, 2001, and payment of attendant disability insurance and medical benefits under Titles II and XVIII of the Social Security Act. Defendant opposes the motion. The court reverses and remands the Commissioner's decision denying benefits.

**FACTS**

Guy Terry was born March 2, 1957. He graduated from high school in 1975 despite academic problems. Terry is married and lives in Black Hawk, South Dakota. (Tr. 72, 201-02).

Terry worked for various companies as a tile setter for 17 years from 1984 to May 2001. (Tr. 67). On May 6, 2001, Terry was bitten by an insect,

presumably a spider, which immediately preceded a serious decline in his health. (Tr. 202). Terry was seen in the Rapid City Regional Hospital emergency room on May 6, 2001, with swelling and tenderness on his foot from a sprain. (Tr. 157-59). Terry was seen on June 21, 2001, in the Rapid City Regional Hospital emergency room for the spider bite. Dr. Michael Mathews reported the 1 centimeter bite area exhibited purple, thickened skin. Dr. Mathews reported that Terry reported experiencing neuropathy in the area and ordered testing to rule out Lyme disease. (Tr. 153-56).

Terry was seen by Dr. William Zavitz on August 6, 2001, for numbness in his feet. Dr. Zavitz noted an MRI revealed some disc degeneration in Terry's back. (Tr. 152). Terry was seen by Dr. Steven B. Schwartz on August 16, 2001, for back pain, nausea, depression, and weight loss. Terry's wife indicated Terry had not been to the doctor in a decade. The doctors took general history and concluded that Terry should cease his long term heavy alcohol and tobacco use, reduce his caffeine intake, and address his depression. Dr. Schwartz began the process of full analysis of Terry's back pain and discovery of several masses in Terry's liver, which Dr. Schwartz expected were benign. Additional tests were ordered and Terry was advised to return for follow-up. (Tr. 109-13, 143-151).

Dr. Schwartz saw Terry again after Terry experienced thigh and back pain on August 22, 2001. Terry reported tingling and numbness in his legs. Terry stated that he had lost significant sleep because lying down exacerbated

this condition. Terry stated chiropractic care did not alleviate the tingling and numbness. Terry also related recently having been diagnosed with kidney stones. After reviewing Terry's MRI back scan, which revealed some disc bulging at L4-5, Dr. Schwartz recommended treatment with steroids, anti-inflammatories, and pain medication. (Tr. 102-06, 114-18). Terry was also seen by physician's assistant (PA) Joanne Detwiler that same day for weight loss, back pain, depression, and alcoholism. Detwiler reported that Terry smelled strongly of alcohol and claimed he had not drank for several days. Detwiler noted normal liver functioning after several days of abstinence from alcohol. Detwiler also encouraged Terry to seek help with his alcohol and depression problems. Detwiler discussed maintenance and treatment of his kidney stones. (Tr. 107-08). Terry was seen by Dr. Roger Millea on August 24 and 27, September 4 and 19, and October 3, 2001 for treatment of kidney stones. (Tr. 121-42).

On September 6, 2001, Terry's wife called Detwiler to obtain pain medication for Terry's constant pain. (Tr. 120). On November 5, 2001, Detwiler called Terry's wife to check on Terry. She reported that Terry had not taken the prescribed steroids, but had improvement in his back and legs. Terry's wife expressed doubts that Terry would return for assistance with his alcoholism. (Tr. 120).

On June 24, 2002, Dr. Robert MacLachlan performed a neurology consult on Terry. Dr. MacLachlan diagnosed peripheral neuropathy in Terry's

3

lower extremities, possibly related to Terry's degenerative disc issue. Dr. MacLachlan noted that although Terry's weight had reduced recently, his muscle bulk was still within the normal range. Terry reported his symptoms prevented him from most activity and that he spent most of his day sitting or lying down and watching television. When Dr. MacLachlan commented on Terry's well-tanned upper body, Terry did admit outside garden work. (Tr. 160-64).

On July 2, 2002, Dr. F.R. Entwistle completed a Physical Residual Functional Capacity Assessment for Terry. Dr. Entwistle found that Terry could lift and/or carry 20 pounds occasionally and 10 pounds frequently with unlimited capacity to push or pull within these weight limitations. Dr. Entwistle found that Terry could stand, sit and/or walk about 6 hours in an 8-hour workday. Dr. Entwistle opined that Terry could frequently balance and climb ramps or stairs, but could never climb ladders, ropes, or scaffolds. Dr. Entwistle found that Terry could occasionally stoop, kneel, crouch, and crawl and should avoid exposure to hazards such as machinery or heights. Dr. Entwistle's overall opinion noted that Terry's self limitations seemed to be greater than warranted by objective medical information. (Tr. 186-93).

On July 3, 2002, Richard Gunn, Ph.D., completed a Psychiatric Review Technique form for Terry. Dr. Gunn determined that Terry's affective disorder pain impairment was not severe. Under the "B" criteria, Dr. Gunn found that Terry had no episodes of decompensation and had only mild limitations in all

4

other areas. Dr. Gunn noted that Terry had pain limiting his daily living activities and sleep, but that Terry goes outside daily, visits family, and reads the paper. Dr. Gunn indicated that although Terry stated he was depressed, he was not using any depression medications. (Tr. 171-84).

On September 25, 2002, Dr. Stephen Hempelman also conducted a neurology review with Terry. Dr. Hempelman did not complete the work up due to time limitations, but found that the peripheral neuropathy experienced by Terry was probably not caused by his disc disease, but may have been caused by the spider bite or Terry's past labor work as a tile setter. (Tr. 165-70).

Terry represented himself at the January 9, 2003, hearing. The ALJ allowed Dr. James Simpson to testify. Dr. Simpson testified that the record held very little evidence of a psychological or psychiatric condition. Terry confirmed that he felt he had a depressive condition and the ALJ confirmed that the records would support that claim.

Terry testified that he was 44 and married. A recent weight loss of 20 pounds made his current weight 135 pounds. Terry described his work as a tile setter as heavy and stated that he had been unable to do the work since May 2001 because of peripheral neuropathy in his waist, legs, feet, toes, and, most recently, his hands. He described a stinging, burning pain in these areas and that these areas were also frequently numb and cold. Terry stated his muscles were weak and that he frequently dropped things, but that he

could pick up small items, like a pencil or needle, with no difficulty. He testified that a doctor had informed him that some of his symptoms may have been caused by his heavy work as a tile setter.

Terry stated that Dr. Hempelman in Arizona suggested that Terry go to the Mayo Clinic to determine the cause of his peripheral neuropathy. When he went to Mayo Clinic, the physicians were unable to determine if his symptoms were caused by the spider bite and told him that there was no cure for peripheral neuropathy.[1]

Terry indicated he is able to tend to his hygiene, but that he was unable to take showers, only baths. Terry indicated he is unable to do housework. He arises at 7 a.m. and then sits, reads, or watches television for awhile. He goes back to bed at 10 a.m. because of fatigue. Terry estimated he would arise again at 1 p.m., but he was unable to do more than read or watch television. Terry estimated he can sit for 45 minutes at a time and stand for an hour and a half. Terry thought he could lift 60 pounds, but he could not carry 50 pounds and would be forced to drag it. Terry opined that he was unable to handle gallons of milk all day.

Terry estimated he could walk an eighth of a mile. Terry expressed difficulty with stooping and bending because of leg weakness. Terry stated his

---

[1] Terry eventually submitted records for a January 3, 2003, emergency room visit at the Mayo Clinic Hospital in Phoenix, Arizona, but the record merely reviews his symptoms and recommends that he wait for an appointment for a full neurological review at Mayo's regular clinic. (Tr. 194-196).

leg weakness makes him feel as if he will fall, which is why he cannot take showers. Terry explained the numbness in his feet exacerbates this problem. The ALJ asked Terry to submit the Mayo records and a list of current medications. The ALJ also told Terry he would need to submit to a psychological consult to more fully develop the records as to Terry's mental health status. (Tr. 208-33).

After the hearing, on February 14, 2003, Christopher Elia, Ph.D., completed a psychological evaluation of Terry. Dr. Elia diagnosed a pain disorder that would preclude Terry from employment. Dr. Elia opined that Terry would benefit from a pain management treatment program and medication, but that Terry was not likely to be compliant with a medication regimen. (Tr. 200-04). Dr. Elia also provided a Medical-Source Statement of Ability to Do Work-Related Activities (Mental) form for Terry. Dr. Elia stated that Terry had slight restrictions on his ability to maintain attention or concentration over time, adhere to standards of neatness or cleanliness, and respond appropriately to changes in the workplace. Dr. Elia opined that Terry would have moderate restrictions on his ability to maintain a normal workweek and extreme restrictions on his ability to perform at a consistent pace. (Tr. 205-07).

On May 12, 2003, vocational expert Jerry D. Gravatt (VE) submitted interrogatory responses regarding Terry. The VE opined that although Terry was unable to perform his past work, he had developed transferable skills.

The VE was told that Terry could sit for 45 minutes, stand one and a half hours at a time, walk an eighth of a mile, lift 60 pounds at one time, but only carry 10 pounds, had weakened hand strength bilaterally, and the psychological limitations outlined in Dr. Elia's February 2003 report. The VE opined that with these limitations, Terry could perform the light work of a survey worker, with 211,750 jobs nationally and 235 regionally, lot attendant with 861,194 jobs nationally and 394 regionally, or rental agent with 154,230 jobs nationally and 325 regionally or the sedentary work of a motor vehicle dispatcher with 317,844 jobs nationally and 1,590 regionally, surveillance system monitor with 1,158,730 jobs nationally and 1,660 regionally, or telemarketer with 602,400 jobs nationally and 1,150 regionally. The VE further testified that Terry had a number of mild limitations. The VE acknowledged that Terry had an extreme limitation on performing at a consistent pace, but that would not prevent him from he jobs listed, as they do not demand a consistent performance. (Tr. 94-98).

## ALJ DECISION

Terry filed for Social Security Disability benefits on January 22, 2002, under Titles II and XVIII of the Social Security Act. He alleged disability beginning May 6, 2001. The Social Security Administration (SSA) denied his claim and Terry timely requested a hearing before an ALJ. The claim went to hearing before ALJ James W. Olson on January 9, 2003.

On July 30, 2003, ALJ Olson issued an unfavorable decision. After applying the sequential five-step evaluation process,[2] the ALJ concluded that Terry was not entitled to benefits. First, the ALJ determined Terry had not engaged in any substantial gainful activity since his alleged onset date of May 6, 2001. Second, the ALJ found that Terry suffered from the following medically determinable impairments: peripheral sensorimotor neuropathy, bilateral L5 foraminal narrowing, and alcohol abuse. Third, he concluded that the impairments were "severe" but less severe than required by the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, appendix 1.

Next, the ALJ determined Terry's residual functional capacity (RFC) by reviewing medical records and testimony of witnesses. Medical evidence was conflicting, and the ALJ felt Terry's subjective complaints were only partially credible. He determined Terry had the RFC to perform light work with the following limitations: He can sit 45 minutes at a time and stand 1½ hours, and perform related physical activities for 8 hours per day. He can walk an eighth of a mile, lift 60 pounds and carry 10 pounds. The ALJ determined

---

[2]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

Terry had no severe mental limitations. The ALJ noted that no physician had ever placed Terry on restrictions, no significant records of past mental health treatment existed, gaps in overall medical treatment existed including one of eight months, and conflicting evidence regarding the extent of Terry's alcoholism was in the record.

The ALJ also noted that while some of non-treating source, Dr. Elia's findings were valid, his claim that Terry was completely incapable work was too broad and nonspecific. The ALJ did accept Dr. Elia's finding that Terry had extreme limitations on his ability to perform at a consistent pace.

For the last step, the burden shifted to the Commissioner to prove that there were other jobs Terry could still perform in the national economy. Based on interrogatories answered by VE Jerry Gravatt, the ALJ concluded Terry could perform a significant number of jobs that exist in significant numbers in the national economy, such as survey worker, lot attendant, rental agent, motor vehicle dispatcher, surveillance system monitor, or telemarketer. Therefore, the ALJ found Terry was not disabled. The SSA Appeals Council denied review of the ALJ's decision.

**STANDARD OF REVIEW**

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it

adequate to support the conclusion. Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision. Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under § 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). See also Smith v. Shalala, 987 F.2d at 1374. The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If

the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

### DISCUSSION

Terry claims that because the ALJ found that Terry has extreme limitation on his ability to perform at a consistent pace, he should be found disabled at Step Three because he meets the "B" criteria for a mental impairment listing. The mental impairment listings use four criteria, called the "B" criteria, to judge severity. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00C., 1-4. The "B" criteria are:

1. Restrictions of activities of daily living;

2. Difficulties in maintaining social functioning;

3. Difficulties in maintaining concentration, persistence, or pace;

4. Repeated episodes of decompensation, each of extended duration.

Id.

The claimant is to be rated in the first three functional areas on a five-point scale, namely: none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The fourth functional area is rated on a four-point scale, namely: none, one or two, three, four or more. Id. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." Id. See also Pratt v. Sullivan, 956 F.2d 830, 835

n.11 (8th Cir. 1992).  Degrees of limitation higher than "marked" satisfy the listings, thereby precluding the necessity for the ALJ to complete a residual functional capacity assessment.  Pratt, 956 F.2d at 835 n.11.

Terry was found by Dr. Elia to have "extreme" limitations in his ability to perform at a consistent pace.  The Medical Source Statement of Ability to Do Work-Related Activities (Mental) form completed by Dr. Elia describes an extreme limitation as "no useful ability to function in this area."  (Tr. 205).  The ALJ accepted this finding.  Thus, Terry meets a listing level impairment.

The Commissioner contends that the Medical Source Statement of Ability to Do Work-Related Activities (Mental) form's reference to "consistent pace" is not equivalent to the "maintaining pace" requirement of the "B" criteria in the listings.  The Commissioner has cited no legal authority as support for this contention, however, and the court does not draw such a distinction.

In this case, the ALJ found that Terry had no ability to function at a consistent pace.  If the ALJ had properly found that Terry met a listing level impairment, Terry would have been found disabled because of a mental disorder.  See Cunningham v. Apfel, 222 F.3d 496, 503 (8th Cir. 2000) (plaintiff would have been awarded benefits if not for erroneous findings of ALJ).  Because Terry has demonstrated his disability by meeting a listing level impairment, the court finds that "further hearings would merely delay benefits."  Id.

13

## CONCLUSION

The ALJ erred by finding that Terry was not disabled despite no useful ability to perform work at a consistent pace.  Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Terry's claim for disability benefits under Titles II and XVIII of the Social Security Act is reversed and remanded consistent with this opinion.  This matter is remanded for an award of benefits dating to May 6, 2001.

Dated July 8, 2005.

        BY THE COURT:


        /s/ *Karen E. Schreier*
        KAREN E. SCHREIER
        UNITED STATES DISTRICT JUDGE